**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| OLA BROWN, | ) | CASE NO. 1:17CV1912 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendant. | ) | |

Plaintiff, Ola Brown ("Plaintiff" or "Brown"), challenges the final decision of Defendant,

Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"), denying her

applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under

Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act"). This

Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to

28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's final decision is

AFFIRMED.

## I. PROCEDURAL HISTORY

In October 2014, Brown filed an application for POD and DIB, alleging a disability onset

date of April 1, 2014 and claiming she was disabled due to coronary artery disease, thoracic or

lumbosacral neuritis or radiculitis, displacement of lumbar intervertebral disc, and spinal

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

stenosis.  (Transcript ("Tr.") at 109, 442, 493.)  The applications were denied initially and upon

reconsideration, and Brown requested a hearing before an administrative law judge ("ALJ").

(Tr. 109, 400-403, 406-408, 409.)

On August 12, 2016, an ALJ held a hearing, during which Brown (who was not

represented by counsel) and an impartial vocational expert ("VE") testified.  (Tr. 340-374.)  On

March 14, 2017, the ALJ issued a written decision finding Brown was not disabled.  (Tr. 109-

120.)  Brown subsequently retained counsel and submitted additional medical records in support

of her application.  (Tr. 2, 94.)  The Appeals Council declined further review on August 18,

2017.  (Tr. 1-6.)

On September 12, 2017, Brown filed her Complaint to challenge the Commissioner's

final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 15,

17.)  Brown asserts the following assignments of error:

> (1)  The ALJ's determination that Ms. Brown's orthopedic disorders do not
> meet or equal a listed impairment is in error and not supported by
> substantial evidence.
>
> (2)  There is good cause for Plaintiff's failure to submit material new
> evidence, which proves that Plaintiff's orthopedic conditions meet or
> equal the Listings and erode the capacity for sedentary work, thereby
> requiring remand.

(Doc. No. 15.)

## II.  EVIDENCE

### A.  Personal and Vocational Evidence

Brown was born in March 1958 and was fifty-eight (58) years-old at the time of her

administrative hearing, making her a "person of advanced age" under social security regulations.

(Tr. 442.)  *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e).  She has a college education and is able

to communicate in English.  (Tr. 351.)  She has past relevant work as a data entry clerk, tax preparer, receptionist, clerk typist, and general office clerk.  (Tr. 119.)

**B.     Relevant Medical Evidence[2]**

The record reflects Brown complained of low back pain and severe left leg pain as early as October 2009.  (Tr. 649-650.)  At that time, orthopedist Susan Stephens, M.D., noted decreased range of motion and tenderness in Brown's left knee and lumbar spine, as well as positive straight leg raise on the left.  (*Id*.)  Brown denied altered gait or motor weakness and ambulated without an aid.  (*Id*.)  Motor and neurologic examinations were normal.  (*Id*.)  Dr. Stephens noted Brown had a history of coronary artery bypass surgery and right knee surgery for a patella fracture.  (*Id*.)  She diagnosed lumbar spondylosis with radiculopathy and left knee arthritis; and prescribed Naprosyn and Robaxin.  (*Id*.)

Several years later, in January 2012, Brown underwent an x-ray of her lumbar spine, which revealed lumbar disc facet disease and early osteoarthritis of the left hip.  (Tr. 642.)  On February 24, 2012, Brown underwent an MRI of her lumbar spine which showed the following: (1) minimal disk bulging and facet hypertrophy producing bilateral stenosis at L2-3; (2) facet hypertrophy producing mild bilateral stenosis at L3-4; (3) mild diffuse disk bulging, bilateral facet hypertrophy, and ligamentum flavum thickening producing mild bilateral foraminal stenosis at L4-5; and (4) a broad-based herniated disk, bilateral facet hypertrophy, and

_____

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.  In addition, because Brown's assignments of error relate solely to her physical impairments, the Court will confine its discussion of the medical evidence to those impairments.

ligamentum flavum thickening producing severe bilateral foraminal stenosis at L5-S1, as well as left L5 and probable right L5 nerve root impingement.  (Tr. 643-644.)

On May 25, 2012, Brown reported she "recently has had lots of epidural blocks and facet injections without relief of her pain."  (Tr. 645.)  Dr. Stephens noted imaging had revealed severe L5-S1 facet arthrosis, as well as disc herniation and resultant foraminal central stenosis.  (*Id.*)

In April 2013, Brown fractured her pelvis after a fall.  (Tr. 694, 791.)  Several months later, in September 2013, Brown reported she was "gradually regaining her level of activity and losing some of the weight she gained."  (Tr. 782.)

On November 1, 2013, Brown began treatment with Shue Que Huang, M.D., at the Physical Medicine & Rehabilitation Clinic.  (Tr. 773-777.)  She complained of low back pain for the previous two years, which she described as intermittent and progressively worsening.  (Tr. 773.)  Brown also reported occasional bilateral leg pain and numbness below the knee, left worse than right.  (Tr. 773-774.)  She stated her pain was aggravated by walking and alleviated by nothing.  (*Id.*)  Brown indicated she could walk about five (5) blocks and was "able to ambulate without devices and perform activities of daily living at an independent level."  (*Id.*)  She indicated she had undergone 8 epidural injections, which had been effective for a "couple months" but the "last few injections lasted a few weeks."  (*Id.*)

On examination, Dr. Huang noted tenderness at the left upper buttock but no evidence of spasm or trigger points.  (Tr. 776.)  She also found normal range of motion, negative straight leg raise, negative Fabers test, normal (5/5) manual muscle strength in the bilateral upper extremities, intact sensation, intact coordination, and normal gait.  (*Id.*)  Reflexes were slightly

reduced (at 1+) in her biceps, triceps, brachioradialis, patella, and ankle. (*Id*.) Overall, Dr. Huang characterized Brown's exam as "benign with no neurological concerns." (*Id*.) She assessed chronic low back pain with some spondylogenic features, and found Brown's bilateral lower extremity pain and numbness "appears to be more consistent with neuropathy." (*Id*.) Dr. Huang recommended Brown start a home exercise program and use a TENS unit. (*Id*.) Brown declined medication and deferred further injections. (*Id*.)

Brown returned to Dr. Huang on June 23, 2014 for follow-up regarding her neck, back and left leg pain, which she rated a 6 on a scale of 10. (Tr. 757-761.) She again reported she could walk about five blocks and was "able to ambulate without devices and perform activities of daily living at an independent level." (Tr. 758-759.) Physical examination findings and diagnoses were the same as the previous visit. (Tr. 760.)

On August 25, 2014, Brown presented to Dr. Huang with complaints of "pain in multiple sites," which she rated a 7 on a scale of 10. (Tr. 747-751.) She again reported she could walk about five blocks and was "able to ambulate without devices and perform activities of daily living at an independent level." (Tr. 748-749.) However, Brown reported increased pain and indicated she had gained 15 pounds in the past six months. (Tr. 748, 751.) Dr. Huang ordered lumbar x-rays and a lumbar MRI given Brown's "persistent radicular pain, [] normal emg, [and] progressive [symptoms]." (Tr. 751.)

Brown underwent a lumbar x-ray that same day. (Tr. 803.) This imaging revealed degenerative changes including (1) disc space narrowing at L4-L5 and L5-S1 with marginal osteophytes at several levels; (2) slight retrolisthesis of L4 with respect to L5; and (3) some widening of the facet joints bilaterally at L5-S1. (*Id*.)

On September 29, 2014, Brown presented to Dr. Huang with complaints of increased pain, as follows:

> Most pain is going down the left side and continues to be the case. She notes that her left leg gave out on her yesterday for the first time ever. Her low back pain continues to bother her and increasingly worse. She notes her worst pain in her left hip region and groin, which is a new pain for the past few weeks. She is not performing any exercises. She notes shooting pain down her left leg anteriorly. She also notes some neurogenic claudication symptoms mostly down her left leg on the top of her foot. On her right, she does not have shooting pain down the right lower extremity but has tingling on the bottom of her foot which is constant. She also complains of shooting pain in her left, pain in her knee as well. The worst is right hip (8/10), gets worse with movement, gets better with unknown. 2nd pain area is her left knee, worse with unknown. Her low back is her 3rd worst region and is more constant than before 5-10. Denies loss of bowel/control - reports bowel accident one occasion. One episode of weakness [left lower extremity]. She continues to smoke - 1ppd after discontinuing patches. She notes that tramadol was not helpful, neither did naproxen. She notes that she is feeling more and more depressed and only sleeping around 2-3 hours per night.

(Tr. 741.) Physical examination findings were largely normal, including normal gait. (Tr. 743-744.) Dr. Huang noted Brown's EMG was negative. (*Id*.) She indicated Brown's left hip pain was consistent with osteoarthritis and ordered a pelvic x-ray, which showed "severe arthritic changes involving the left hip." (Tr. 744, 798-799.) Dr. Huang prescribed Gabapentin and physical therapy. (Tr. 744.)

On October 5, 2014, Brown went to the emergency room ("ER") after experiencing a syncopal event. (Tr. 735.) She reported she was getting up from her chair when her left leg "gave out on her," causing her to fall and pass out. (Tr. 735, 711, 729-730.) Brown presented to Ranier Dg, D.O., several days later for follow-up. (Tr. 728-734.) She complained of pain on her "whole left side," which she rated an 8 on a scale of 10. (Tr. 728.) Dr. Dg noted Brown's gait "can be normal" and indicated she "will occasionally use cane." (Tr. 730.) Physical examination findings were normal, including normal sensation, normal muscle strength, normal

pulses, normal gait, and no edema.  (Tr. 733.)  Dr. Dg advised Brown to continue her medications and "continue with using walking cane for ambulation."  (Tr. 734.)

Brown began physical therapy with Nicole Lynn Grisak, P.T., on October 15, 2014.  (Tr. 721-727.)  She reported pain in her lower back, left leg, and left hip, and indicated she owned a walker and straight cane which she used intermittently.  (Tr. 724.)  Brown indicated there were 14 steps to enter her home "with railings" and indicated she used public transportation.  (*Id.*)  She reported increased difficulty and pain with donning/doffing shoes and socks, dressing, getting in and out of the shower, entering and exiting a car, vacuuming and washing dishes.  (*Id.*)  Brown estimated her standing tolerance as 10-15 minutes; her walking tolerance as 5-10 minutes; and her sitting tolerance as 30 minutes.  (*Id.*)

On examination, Ms. Grisak observed Brown ambulated independently and was in no apparent distress.  (Tr. 725.)  She had mildly to moderately limited range of motion in her trunk, reduced muscle strength, reduced reflexes and decreased sensation in her lower extremities, negative straight leg raise, tenderness to palpation in her lumbar spine (left greater than right), and positive Patricks/Faber.  (Tr. 725-726.)  Brown was able to move from a sitting to standing position independently but Ms. Grisak described her efforts as "labored."  (Tr. 726.)  She was unable to tolerate lifting an item from the floor to her waist.  (*Id.*)  With regard to Brown's gait, Ms. Grisak noted Brown "ambulates independently with decreased step length bilaterally, decreased hip extension and antalgic gait."  (*Id.*)  Brown reported climbing stairs independently at home "but with difficulty."  (*Id.*)

Ms. Grisak assessed impaired gait, decreased bilateral lower extremity strength, decreased bilateral lower extremity flexibility, decreased standing/walking tolerance, and pain.

(Tr. 726.)  She recommended formal physical therapy once to twice per week for a total of eight visits, and indicated a fair to poor prognosis.  (Tr. 726-727.)

On October 24, 2014, Brown began treatment with neuroscientist Samuel Rosenberg, M.D.  (Tr. 716-720.)  She reported radiating lower back pain and indicated her "entire left leg is numb."  (Tr. 717.)  Brown indicated she had fallen twice due to her left leg weakness and numbness.  (Tr. 717-718.)  On examination, Dr. Rosenberg noted decreased motor strength in Brown's left lower extremity, decreased sensation below her left knee, and absent reflexes in her ankle.  (Tr. 720.)  Brown's gait was normal and straight leg raise testing was negative bilaterally.  (*Id*.)  Dr. Rosenberg assessed moderate to severe osteoarthritis of the left hip and lumbar radiculopathy, and referred her for an orthopedic consultation for her hip.  (Tr. 720.)

Brown presented to cardiologist Tilak Pasala, M.D., on October 28, 2014, with complaints of chest pain and shortness of breath.  (Tr. 710-715.)  Physical examination findings were normal, as was an ECG taken that date.  (Tr. 713-714.)  Dr. Pasala assessed possible angina and ordered a stress echocardiogram, which was normal.  (Tr. 714, 797.)

On November 3, 2014, Brown began treatment with orthopedist Brendan Patterson, M.D. (Tr. 706-709.)  On examination, Dr. Patterson found Brown walked with a "slight antalgic gait pattern favoring the left hip."  (Tr. 708.)  She had full range of motion in her extremities, with a slight decreased in internal rotation of her left hip.  (*Id*.)  Dr. Patterson also noted decreased sensation in Brown's left foot but no sign of atrophy in the left calf or thigh.  (Tr. 709.)  Dr. Patterson assessed as follows: "Her symptom complex is partly due to the hip and partly due to the spine.  The patient was counseled that hip arthroplasty would not provide any change in her

left lower extremity neurologic symptoms nor would it deal with any of her low back pain." (*Id.*)

Brown returned to Dr. Huang on November 17, 2014. (Tr. 693-697.) Physical examination findings were benign, including normal gait. (Tr. 696-697.) Dr. Huang noted Brown had been cleared by internal medicine and would undergo a hip replacement. (Tr. 694.) The record reflects Brown underwent a left hip replacement on December 17, 2014. (Tr. 605-611, 893-895.) She was discharged in stable condition on December 20, 2014. (Tr. 619.)

On March 6, 2015, Brown returned to Dr. Patterson for follow-up regarding her left hip. (Tr. 832-833.) She reported "no left hip pain" but indicated she had developed some tingling in her left foot. (Tr. 833.) Brown indicated she continued to use her cane for ambulation. (*Id.*) On examination, Dr. Patterson noted Brown walked with a slight antalgic gait pattern, favoring the left side. (*Id.*) He noted normal motor and sensation in Brown's left foot, and no tenderness to range of motion in her left hip. (*Id.*) Dr. Patterson recommended she continue her home exercise program. (*Id.*)

Brown returned to Dr. Rosenberg on April 14, 2015. (Tr. 825-828.) She reported neck pain and left leg pain, numbness, and swelling. (Tr. 826.) On examination, Dr. Rosenberg noted careful gait, weakness in Brown's left hip flexors, absent sensation below the left knee, and negative straight leg raise. (*Id.*) He prescribed Neurontin and physical therapy. (*Id.*)

On April 21, 2015, Brown presented for physical therapy with Alma Gojani Axhemi, P.T. (Tr. 819-824.) She reported she was independent with self-care and activities of daily living, although she had difficulty with cooking, cleaning, shopping, vacuuming and laundry. (Tr. 821.) Brown described her pain as constant but varying in intensity from a 6 to a 10 on a scale of 10. (*Id.*) She stated her pain worsened with prolonged sitting (30 minutes), prolonged

standing (10-20 minutes), prolonged walking ("short distance only"), and ascending stairs and descending stairs.  (*Id*.)

On examination, Brown had reduced range of motion in her trunk and neck, reduced muscle strength, decreased sensation in her left leg, absent sensation in her left foot, and tenderness in her bilateral paraspinals and left hip.  (Tr. 822-823.)  With regard to Brown's gait, Ms. Axhemi found she was independent without an assistive device but had an antalgic gait with "decreased left stance time."  (Tr. 823.)  Brown performed a 5 meter walk test, which she completed in 11 seconds using a standard cane.  (*Id*.)  Ms. Axhemi assessed "impaired gait pattern and speed, decreased [range of motion] in cervical spine and left hip, decreased strength in [left lower extremity], decreased flexibility in lower extremities [left greater than right], as well as impaired balance."  (Tr. 824.)  She described Brown's prognosis as fair.  (*Id*.)

On July 15, 2015, Brown returned to Dr. Rosenberg for follow-up.  (Tr. 966-967.)  She reported she had undergone physical therapy for six weeks and "she is no better."  (*Id*.)  On examination, Dr. Rosenberg noted antalgic gait, weakness of the left knee extensors, left sided foot drop, left foot numbness, and absent reflexes.  (*Id.*)  Dr. Rosenberg ordered an MRI of her lumbar spine, which Brown underwent that day.  (Tr. 967, 971.)  The MRI revealed the following: (1) minimal broad based disc bulge with bilateral moderate facet hypertrophy and ligamentum flavum hypertrophy causing moderate bilateral neural foraminal stenosis and loss of disc space height at L4-5; (2) large broad based disc bulge as well as severe facet hypertrophy and ligamentum flavum hypertrophy resulting in severe left neural foraminal stenosis and moderate right stenosis at L5-S1 with compression of the left S1 nerve roots.  (Tr. 971-972, 975.)

Brown returned to Dr. Rosenberg on August 4, 2015. (Tr. 974-978.) He assessed (1) lumbar radiculopathy at left L5, with severe foraminal stenosis at L5/S1 left; and (2) lumbar spondylosis at L4/5 and L5/S1. (Tr. 978.) He prescribed injections, which Brown underwent on August 10, 2015. (Tr. 978, 987-988, 1011.) Shortly thereafter, on August 13, 2015, Brown called Dr. Rosenberg complaining that she "is in more pain now that before the injection." (Tr. 1020.) Brown stated she had developed new symptoms in her right lower extremity, including pain in her anterior right thigh and numbness and tingling in her right ankle and foot. (*Id.*)

On August 18, 2015, Brown presented to Dr. Rosenberg with complaints of left swelling foot, decreased sensation in her entire left leg, very poor balance, and burning pain in her left hip. (Tr. 1022-1023.) On examination, Dr. Rosenberg noted the following: "[S]he has decrease in sensation at the middle finger left and decrease in strength at the left triceps and left hip flexors and left knee extensors and flexors. She 'can hardly feel' her left anterior thigh. She cannot walk a straight line without falling." (Tr. 1022.) Dr. Rosenberg ordered an MRI of Brown's cervical spine, which she underwent that date. (Tr. 1023, 1027.) This imaging revealed a mild disc bulge at C4-C6 causing mild effacement and mild cord flattening. (Tr. 1027.)

On October 16, 2015, Brown presented to cardiologist Yan Dong, M.D. (Tr. 1041-1045.) She complained of chest tightness and shortness of breath, particularly with activity. (Tr. 1041.) Brown also described occasional lightheadedness and headaches. (*Id.*) Examination findings were normal and an EKG taken that date showed no significant changes. (Tr. 1043-1045.) Dr. Dong ordered further testing and encouraged Brown to quit smoking. (Tr. 1045.) Brown underwent a myocardial perfusion multi spect on that date, which showed a small infarct in the distal apical cap segments with minimal peri-infarct ischemia. (Tr. 1050.)

On October 22, 2015, Brown returned to Dr. Rosenberg for follow up regarding her neck pain, back pain, and left leg pain and numbness. (Tr. 1055-1059.) Dr. Rosenberg ordered injections in both her lumbar and cervical spines, and increased her Neurontin. (Tr. 1059.) Brown thereafter underwent a lumbar injection at L5/S1 on November 18, 2015. (Tr. 1068-1072.)

Brown returned to Dr. Rosenberg on December 10, 2015. (Tr. 1125-1126.) She complained of numbness in her left thigh, left leg pain and numbness, and back pain. (*Id.*) Dr. Rosenberg noted Brown walked with a cane, had mild diffuse weakness throughout her left leg, and had absent reflexes. (*Id.*) He ordered additional injections, prescribed Percocet, and increased her Neurotin. (*Id.*) Brown underwent a lumbar injection at L2/L3 on January 6, 2016. (Tr. 1133.)

On January 20, 2016, Brown complained of back pain, neck stiffness and headaches, and poor balance. (Tr. 1170-1172.) On examination, Dr. Rosenberg found antalgic gait, tenderness at the lumbar facets, intact sensation, negative straight leg raise, and abnormal reflexes. (*Id.*) He ordered bilateral lumbar facet blocks, prescribed Cymbalta, and continued Brown on Percocet and Neurontin. (*Id.*)

On March 14, 2016, Brown underwent an x-ray of her lumbar spine, which showed (1) grade 1 anterolisthesis of L5 on S1; (2) moderate to severe L4-5 and L5-S1 facet degenerative change; and (3) mild to moderate L4-5 and L5-S1 discogenic degenerative change. (Tr. 1385.)

On April 8, 2016, Brown underwent back surgery (i.e., a bilateral laminectomy of L5 and L4 with lateral recess decompression and foraminotomies, L4-L5 and L5-S1). (Tr. 1392, 1394-1396.) She was discharged from the hospital in stable condition on April 11, 2016. (Tr. 1392.)

On May 18, 2016, Brown presented to Nicholas Ahn, M.D., the surgeon who performed her back surgery. (Tr. 1404-1406.) Brown reported "doing great" post-surgery, indicating the "severe radicular pain has largely resolved." (Tr. 1404.) She did complain of "a bit of burning" in her left thigh, however. (*Id.*) Dr. Ahn noted that Brown had promised to quit smoking but had failed to do so, and stated "this may be why she is having some delayed healing of her nerve." (*Id.*) He further stated Brown "understands and understood from the start that surgery has a much lower success rate if she [continues] to smoke in terms of the nerve successfully healing." (*Id.*)

On examination, Dr. Ahn noted Brown had normal muscle strength and sensation but walked with a "slightly antalgic gait" and had significant medial joint line tenderness and positive McMurray sign about the right knee. (*Id.*) He stated that x-rays showed "good healing and that her lumbar spine is stable."[3] (*Id.*) Dr. Ahn was concerned, however, that she might fall due to her right knee condition. (*Id.*) He prescribed physical therapy, counseled Brown once again to quit smoking, and referred her to a specialist for evaluation of her knee. (*Id.*)

On that same date, Brown underwent an x-ray of her right knee. (Tr. 1384.) This imaging revealed moderate joint space narrowing of the medial and lateral compartments and severe osteophytosis, joint space narrowing, and sclerosis of the patellofemoral compartment. (*Id.*) It also showed a serpiginous lesion within the proximal tibia most likely representing a bone infarct. (*Id.*)

---

[3] Specifically, a lumbar x-ray taken that date showed (1) interval laminectomy of L4-L5 with unchanged appearance of mild anterolisthesis of L4 on L5; and (2) moderate facet hypertrophy and joint space narrowing of L3-L4, L4-L5, and L5-S1. (Tr. 1407.)

In June 2016, Brown presented for another round of physical therapy. (Tr. 1420-1424.) In response to a Modified Oswestry Low Back Pain Questionnaire, Brown indicated that: (1) "pain medication provides me moderate relief from pain;" (2) "it is painful for me to take care of myself and I am slow and careful;" (3) "I can lift only very light weights;" (4) "pain prevents me from walking more than 1/4 mile;" (5) "pain prevents me from sitting more than ½ hour;" (6) "pain prevents me from standing more than 10 minutes;" (7) "even when I take pain medication, I sleep less than 4 hours;" (8) "pain has restricted my social life to my home;" (9) "pain prevents all travel except to doctor/therapy visits;" and (10) "pain prevents me from doing anything but light activities." (Tr. 1419.)

On June 24, 2016, Brown presented to Matthew Kraay, M.D., for evaluation of her right knee pain. (Tr. 1409-1410.) Her major concern was not pain but rather "intermittent giving way" in her leg. (*Id*.) Brown stated her leg feels like it is going to "give out" three or four times per day and indicated she had fallen several times. (*Id*.) On examination, Dr. Kraay noted a "slow minimally antalgic gait." (*Id*.) He noted her knee was normally aligned with mild effusion and patellofemoral crepitation with range of motion. (*Id*.) Dr. Kraay found her right knee x-ray showed "severe patellofemoral arthritis" and "a large bone infarct in her proximal tibia." (*Id*.) Nonetheless, Dr. Kraay was not certain that her giving way was related to her knee. (*Id*.) He recommended a cortisone injection, which Brown underwent that date. (*Id*.) Dr. Kraay also advised that she "should be using a cane or walker for safety" and should "try and delay joint replacement surgery for as long as possible." (*Id*.)

On July 11, 2016, Brown underwent an x-ray of her lumbar spine. (Tr. 1382.) This imaging revealed "redemonstration of grade 1 anterolisthesis of L5 on lumbarized S1 now

measuring 1.2 cm versus 5 mm in the previous study." (*Id.*) It also showed advanced and

unchanged degenerative changes of the lower lumbar spine most prominent at L4-L5 and L5-S1

with disc space loss, endplate sclerosis, and osteophyte formation. (*Id.*)

> On that same date, Brown presented to Dr. Ahn, who noted as follows:
>
> She states that she was initially doing well until about a month and a half ago. In fact, I saw her on 5/18/16 and she was markedly improved from where she was before. She was still smoking after surgery, and I emphasized to her as I did before the operation that she absolute[ly] positively have to quit. She promised to quit before the surgery and again promi[sed] when I saw her last on 5/18/16.
>
> In any event, she is having recurrent symptoms that are now getting worse over the past 6 weeks. The pain runs down both lower extremity, is worse on the left than on the right. She still has not quit smoking. When I explained to her that this is going to be very important, she became very angry and I had to bring in my nurse, Lynette Bennett talked to her as well.
>
> In addition, I looked at the x-rays from 6 weeks ago, i.e, her first postoperative visit on 5/18/16. This shows at the L5-S1 level was still stable and that the fusion appeared to be healing. On today's visit, there is a significant spondylolisthesis at the L5/S1 level. Therefore, there certainly is a reason why she is having recurrent radicular symptoms.
>
> We talked about different treatment options. Revising the fusion would actually not be an option whatsoever until she quit smoking, and I have concerns that she is now challenging whether not smoking is really an issue. Especially if she does not quit, any surgery that I do is unlikely to work and she'll just get another nonunion which will become more of a problem.

(Tr. 1411.) By the end of the visit, Dr. Ahn felt he had convinced Brown of the urgent need to

quit smoking. (*Id.*) He was concerned, however, that "we may be beyond the point the fusion

can actually consolidate." (*Id.*) Dr. Ahn referred Brown to her primary care physician for

assistance in smoking cessation, and to pain management "so we can at least provide some relief

of her symptoms in the interim until we can get her to quit smoking and revision surgery may be

an option." (Tr. 1411-1412.) He also recommended lumbar epidural injections once per month for three months. (*Id.*)

## C.     Relevant State Agency Reports

On March 19, 2015, state agency physician Lynn Torello, M.D., reviewed Brown's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment. (Tr. 393-394.) Dr. Torello found Brown could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of 2 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday. (*Id.*) She further opined Brown had unlimited push/pull capacity and could frequently balance; occasionally climb ramps/stairs, stoop, kneel, crouch, and crawl; and never climb ladders, ropes, or scaffolds. (*Id.*) Lastly, Dr. Torello concluded Brown had no manipulative, visual, communicative, or environmental limitations. (*Id.*)

On June 4, 2015, state agency physician Anton Freihofner, M.D., reviewed Brown's medical records and completed a Physical RFC Assessment. (Tr. 383-384.) Like Dr. Torello, Dr. Freihofner found Brown could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of 2 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday. (*Id.*) Dr. Frehofner further concluded Brown had unlimited push/pull capacity and could occasionally climb ramps/stairs, balance, and stoop but never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. (*Id.*) He found Brown had no manipulative, visual, communicative, or environmental limitations. (*Id.*)

On June 18, 2015, Brown underwent a psychological consultative examination with Joseph Konieczny, Ph.D. (Tr. 598-600.) Brown indicated she had come via public

16

transportation and was somewhat irritable initially.  (Tr. 598.)  Brown reported recent feelings of depression and a history of depression "since her back problems."  (*Id.*)  She acknowledged daily crying episodes, mood swings, irritability, diminished energy level, and some past thoughts of suicide.  (Tr. 598-599.)  On examination, Dr. Konieczny noted Brown's "movements were quite slow and labored" and indicated "she used a cane to assist with her walking."  (Tr. 599.)  Brown's speech was normal and "her ability to concentrate and to attend to tasks showed no indications of impairment."  (*Id.*)  Her insight "seemed fair" and "she showed no deficits in her overall level of judgment."  (Tr. 600.)  Dr. Konieczny noted that Brown "participates in cooking, cleaning, laundry, and household tasks to the extent in which she perceives she is physically capable," noting "she performs her own shopping tasks and manages her own finances."  (*Id.*)

Dr. Konieczny assessed "other specified depressive disorder, depressive episodes with insufficient symptoms."  (*Id.*)  He found no obvious limitations in her abilities to understand, remember, and carry out instructions; or in the area of attention, concentration, and persistence in single and multi-step tasks.  (*Id.*)  Dr. Konieczny did find, however, that Brown "would show some diminished tolerance for frustration and diminished coping skills which would impact her ability to respond to severe supervision and interpersonal situations in the work setting."  (*Id.*)  He also found diminished coping skills for responding to "severe pressure situations in the work setting."  (*Id.*)

On July 17, 2015, state agency pscyhologist Aracelis Rivera, Psy.D., reviewed Brown's medical records and completed a Psychiatric Review Technique ("PRT").  (Tr. 381.)  Dr. Rivera found Brown had mild limitations in her activities of daily living, maintaining social functioning,

and maintaining concentration, persistence, or pace. (*Id*.) Dr. Rivera concluded Brown's mental impairments were not severe. (*Id*.)

**D.     Hearing Testimony**

During the August 12, 2016 hearing, the ALJ noted Brown was unrepresented and explained she had "the right to be represented by either an attorney or a non-attorney in this proceeding." (Tr. 343-344.) The ALJ stated Brown had the option to reschedule the hearing for the "near future" in order to allow her time to find a representative. (Tr. 344-345.) Brown elected to proceed without a representative. (Tr. 345.) Brown then testified to the following:

- She lives alone in the upstairs unit of a two family home. (Tr. 350.) She has to hold onto a handrail to go up the stairs leading into her house. (Tr. 358.) The washer and dryer are in the basement. (Tr. 350.)

- She graduated from college with a Bachelor's Degree in accounting. (Tr. 351.) She also has Masters Degrees in accounting and financial management, and public administration. (*Id*.)

- She is not currently working. (Tr. 350.) She last worked on a temporary basis for the IRS as a customer service representative, from January to March 2014. (Tr. 352.) Prior to that, she worked as a Senior Clerk for the City of Cleveland, Division of Environment. (Tr. 353.) Her job responsibilities included answering the complaint line, training inspectors, logging tickets, etc. (*Id*.) She was discharged from this job when her medical problems caused excessive absenteeism. (Tr. 355.) She also has past work as a tax preparer, remittance clerk, and office worker. (Tr. 354-356.)

- She does not have a drivers license. (Tr. 350-351.) She cannot use public transportation because she cannot walk to the bus stop from her home due to her back, knee, and hip pain. (Tr. 362, 368-369.) The bus stop is approximately .4 miles from her home; she can make it approximately halfway there before needing to stop. (Tr. 362.) She currently uses transportation provided by her insurance company to get to her doctor's appointments. (Tr. 351.) To go to the grocery store, she either pays someone to drive her or her brother goes shopping for her. (*Id*.)

- She cannot work because she experiences constant daily pain in her lower back, knees, and hips. (Tr. 362-364.) She has a compressed nerve at L5-S1 which

causes pain that radiates into her hips and causes a total lack of feeling from her left knee down. (Tr. 364.) Every day, her pain ranges from between a 5 and 10 on a scale of 10. (*Id.*) She also experiences muscle spasms in her legs that wake her up at night. (Tr. 361-362.)

- She had a hip replacement in December 2014. (Tr. 358.) She has been prescribed both a cane and a walker. (*Id.*) She has used the cane since her hip surgery. (*Id.*) She had back surgery in April 2016. (Tr. 360.) She felt better at first but then started experiencing pain in June or July 2016 when her "bone shifted." (*Id.*) Her doctor told her they may do a revision surgery but only if she can stop smoking. (*Id.*) She is having difficulty quitting smoking. (*Id.*)

- Her medication side effects also prevent her from working. (Tr. 362.) These side effects include blurred vision, drowsiness, and balance problems. (Tr. 363.) In addition, she suffers from insomnia and only sleeps approximately two to four hours per night. (Tr. 361.)

- She can stand for a total of 1 to 2 hours. (Tr. 363.) She can lift no more than a jug of milk. (*Id.*) She has to constantly alternate between sitting and standing. (Tr. 365.) She can take of her personal needs (such as bathing, dressing, toileting, etc.) and prepares her own meals. (Tr. 357-358.) Her brother and nephews help with the household chores. (*Id.*) She grocery shops once per month and vacuums twice per month. (Tr. 359.) She does the laundry but needs help bringing her clothing up and down the stairs. (Tr. 358-359.) She has not walked her dog in two years. (Tr. 362.) She uses her cane or walker "all the time." (Tr. 369.)

The VE testified Brown had past work as a data entry clerk (sedentary, semi-skilled, SVP 4); tax preparer (sedentary, semi-skilled, SVP 4); receptionist (sedentary, semi-skilled, SVP 4); clerk typist (sedentary, semi-skilled, SVP 4); and general office clerk (classified as light but performed as medium, semi-skilled, SVP 3). (Tr. 370.) The VE also testified Brown's clerical skills (record keeping, report writing, filing, scheduling, accounting, and keyboarding) were transferable to sedentary. (Tr. 370-371.)

The ALJ then posed the following hypothetical question:

[A]ssume a hypothetical individual the claimant's age and education and the past jobs that you described. Further assume this individual is limited as follows. This

is a sedentary[4] exertional hypothetical with the following additional limitations. This individual can occasionally push and pull with the left lower extremity and . . . occasional foot controls with the left . . . This person can occasionally climb ramps and stairs, never ladders, ropes or scaffolds. Can occasionally balance, occasionally stoop, never kneel, never crouch, and never crawl. This person can never be exposed to unprotected heights or moving mechanical parts. And can never engage in commercial driving. And this person requires the use of a cane for ambulation. Can this individual perform any of the past jobs that Ms. Brown performed?

(Tr. 371.) The VE testified the hypothetical individual would be able to perform Brown's past work as a data entry clerk, tax preparer, receptionist, and clerk typist but not her past work as a general office clerk. (Tr. 371-372.)

The ALJ then asked a second hypothetical that was the same as the first but with the additional limitation that "this person will be absent from work 7 days a week due to inability to catch transportation or public transportation." (Tr. 372.) The VE testified such an individual would not be able to maintain a job. (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments,

---

[4] "Sedentary work" is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a). SSR 83–10 provides that "Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her

past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Brown was insured on her alleged disability onset date, April 1, 2014, and remained insured through June 30, 2018, her date last insured ("DLI.") (Tr. 109.) Therefore, in order to be entitled to POD and DIB, Brown must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through June 30, 2018.

2.    The claimant has not engaged in substantial gainful activity since April 1, 2014, the alleged onset date (20 CFR 404.1571 et seq.)

3.    The claimant has the following severe impairments: degenerative disc disease, status-post lumbar fusion, lumbar radiculopathy, degenerative joint disease of the left hip status-post total arthroplasty, coronary artery disease, and degenerative joint disease of the knees (20 CFR 404.1520(c)).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform sedentary work as defined in 20 CFR 404.1567(a) except she is limited to occasional operation of foot controls with the left lower extremity. She is limited to occasional pushing/pulling with the left lower extremity. She requires a cane for ambulation. She is limited to occasional climbing of ramps and stairs; never climbing ladders, ropes, or scaffolds; occasional balancing and stooping; and

never kneeling, crouching, or crawling. She cannot perform work at unprotected heights, around moving mechanical parts, or requiring operation of a commercial motor vehicle.

6.     The claimant is capable of performing past relevant work as a Data Entry Clerk, Tax Preparer, Receptionist, and Clerk Typist. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2014, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 109-120.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy*, 594 F.3d at 512; *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner

are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White*, 572 F.3d at 281; *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld

where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996)); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely

overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

*Listings 1.02, 1.03, 1.04*

In her first assignment of error, Brown argues "the ALJ's evaluation of her orthopedic impairments under the listings is in error and not supported by substantial evidence."  (Doc. No. 15 at 13.)  Specifically, she maintains the ALJ improperly concluded she was capable of ambulating effectively and, therefore, did not meet or equal Listings 1.02, 1.03, and 1.04.  (*Id*. at 14.)  Brown argues the ALJ cited to "limited and misleading portions" of the record and failed to acknowledge or address "extensive medical evidence" showing her inability to walk a block at a reasonable pace, use standard public transportation, and carry out routine ambulatory activities such as shopping and banking.  (*Id*. at 13.)  In this regard, Brown emphasizes she has been prescribed a cane and is unable to use public transportation because she cannot walk to the bus stop.  (*Id*. at 15.)

The Commissioner argues the ALJ properly found the record did not establish an "inability to ambulate effectively" for purposes of social security regulations.  (Doc. No. 17 at 12-13.)  She asserts that, although there is evidence Brown used a cane, she has failed to establish she required the use of a "hand held assistive device that limited the functioning of both upper extremities," as required by the regulations.  (*Id*. at 13.)  The Commissioner also notes Brown reported an ability to walk five blocks, walk a distance of .2 miles to the bus stop, care for her personal needs independently, grocery shop once/month, and vacuum twice/month.  (*Id*.

at 14-15.) Finally, the Commissioner argues that, although the record contains findings of antalgic gait, this is not sufficient, standing alone, to show an "inability to ambulate effectively." (*Id*. at 16.)

At the third step in the disability evaluation process, a claimant will be found disabled if her impairment meets or equals one of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 15 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in

severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. Appx. 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416-17. *See also Harvey v. Comm'r of Soc. Sec.*, 2017 WL 4216585 at * 5 (6th Cir. March 6, 2017) ("In assessing whether a claimant meets a Listing, the ALJ must 'actually evaluate the evidence,' compare it to the requirements of the relevant Listing, and provide an 'explained conclusion, in order to facilitate meaningful judicial review.'" (quoting *Reynolds*, 424 Fed. Appx. at 416); *Joseph v. Comm'r of Soc. Sec.*, 2018 WL 3414141 at * 4 (6th Cir. July 13, 2018) (same).

Here, Brown's challenge to the ALJ's step-three analysis is limited to Listings 1.02 (major dysfunction of a joint); 1.03 (reconstructive surgery or surgical arthrodesis of a major weight-bearing joint), and/or 1.04. These Listings are defined as follows:

> **1.02 *Major dysfunction of a joint(s) (due to any cause)***: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or ankylosis of the affected joint(s). With:
>
> A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]
>
> * * *

**1.03** *Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint*, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

**1.04** *Disorders of the spine* (e.g., herniated nucleus pulposus, spinal arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet arthritis, vertebral fracture), resulting in compromise of a nerve root (including the *cauda equina*) or the spinal cord. With:

A. Evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine);

or

B. Spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every 2 hours;

or

C. Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

20 C.F.R. § 404, Subpt. P, App. 1.

At step two, the ALJ determined Brown suffered from the severe impairments of degenerative disc disease, status post lumbar fusion, lumbar radiculopathy, degenerative joint disease of the left hip status-post total arthroplasty, coronary artery disease, and degenerative joint disease of the knees.  (Tr. 111.)  The ALJ then determined, at step three, that Brown's impairments did not meet or equal Listings 1.02, 1.03, or 1.04, explaining as follows:

After a thorough review the record, I find no evidence supporting the claimant meets or medically equals the criteria of any of the listed impairments described

in Appendix I of the Regulations (20 CFR, Part 404, Subpart P, Appendix I, Regulations No. 4). Further, no treating or examining physician has mentioned findings equivalent in severity to the criteria of any listed impairment. In reaching this conclusion, I have considered the opinions of the State agency medical consultant(s), who evaluated this issue during the administrative review process (20 CFR 404.1512 and SSR 96-6p). Notably, no acceptable medical source of record has opined the claimant meets or medically equals a Listing.

The claimant does not meet or medically equal Listing 1.02, Dysfunction of a Major Joint, or 1.03, Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, because the record does [not] reflect the claimant lost the ability to ambulate effectively. As cited below, the claimant was able to ambulate effectively during the adjudicatory period.

The claimant's spinal disorder does not meet the criteria of Section 1.04, Disorders of the Spine, because the record does not reflect (1) evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss with accompanied sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); (2) spinal arachnoiditis; or (3) lumbar spinal stenosis causing pseudoclaudication resulting in inability to ambulate effectively, as defined in 1.00B2b.

Notably, Listing 1.00B2B generally defines ineffective ambulation "as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities." **As extensively discussed below, the claimant ambulates with a single-pronged cane. In addition, the record does not support an inability to (1) travel without companion assistance; (2) walk without the use of a walker, two crutches, or two canes; (3) walk a block at a reasonable pace on rough or uneven surfaces; use standard public transportation, (4) carry out routine ambulatory activities, such as shopping and banking; and (5) climb a few steps at a reasonable pace with the use of a single hand rail. Although the claimant testified she could not walk to the bus stop before requiring rest, she stated she could walk halfway to the bus stop, which she indicated was two-tenths-of-a-mile away from her home. This level of ambulation is largely inconsistent with an inability to ambulate effectively. As cited below, she also reported an ability to walk five blocks.**

(Tr. 113-114) (emphasis added).

Later in the decision, at step four, the ALJ discussed the evidence regarding Brown's orthopedic impairments at greater length. (Tr. 115-119.) The ALJ acknowledged Brown's

testimony she had ambulated with a cane since December 2014 and that "walking to and from the bus stop on a day to day basis was 'impossible.'" (Tr. 115.)  The decision also, however, noted her testimony she grocery shopped once per month, vacuumed twice per month, and could walk half way (.2 miles) to the bus stop before needing to stop.  (*Id*.)  The ALJ then thoroughly discussed and analyzed the medical and opinion evidence regarding Brown's orthopedic impairments, including the many objective test results and physical examination findings in the record.  (Tr. 116-119.)  The ALJ discussed diagnostic imaging that showed significant degenerative changes in Brown's lumbar spine, left knee, and hip.  (*Id*.)  The ALJ then exhaustively documented Brown's physical examination findings, particularly those relating to her gait:

> In November 2013 and June 2014, the claimant was observed with intact sensation in the extremities, a normal gait, and normal coordination (Exhibit 6F, 72, 88).  In October and November 2014, a physical examination revealed a normal gait, a normal range of spinal motion, negative straight leg raises, bilaterally, full strength in all extremities, bilaterally, except slightly reduced (4/5) strength in the lower left extremity (Exhibit 6F, 8, 32).  A nerve conduction study of the lower extremities was also negative (Exhibit 6F, 9).  The claimant contemporaneously reported she could walk five blocks and was looking for employment as an administrative assistant (Exhibit 6F, 6, 9).

> By October 2014, the claimant was advised to continue using a walking cane for ambulation (Exhibit 6F, 46). * * *  In November 2014, the claimant was also observed with a "slightly" antalgic gait, "slight" decreased in internal rotation of the left hip, and decreased sensation in the left foot (Exhibit 6F, 21, 32).  She contemporaneously elected to proceed with a total left hip arthroplasty, which was performed in December 2014 (Exhibit 6F, 21; 7F, 57). Upon discharge, the claimant was ambulating independently with a cane (Exhibit 7F, 44). Post- surgery imaging also confirmed the claimant's left hip hardware was in "good" alignment (Exhibits 7F, 10; 8F, 37).  Notably, a nurse reported the claimant was not receptive to "any type of rehab" following her hip surgery (Exhibit 7F, 58).

> By April 2015, the claimant began reporting difficulty with daily activities and prolonged sitting, standing, and walking (Exhibit 7F, 16).  Supportively, in April 2015, she was observed walking five meters in 11 seconds with a cane.

Examinations also revealed a decreased walking speed and no sensation below the left knee (Exhibit 7F, 18, 21). However, in April 2015, she also reported it takes 14 steps (with a rail) to enter her home and that she was still independent with her activities of daily living (Exhibit 7F, 16). She reported living upstairs in a "double house," with her brother (who is reportedly a registered nurse) living downstairs (Exhibits 2F, 16; 7F, 44.)

By July 2015, despite six weeks of physical therapy and conservative management with Gabapentin, the claimant continued to have left leg weakness, numbness, and foot drop (Exhibit 11F, 55). In August 2015, the claimant could not walk a straight line without falling and was assessed with poor balance (Exhibit 10F; 111). Contemporaneous diagnostic imaging revealed compression of the left S1 nerve roots with "severe" left foraminal stenosis at LS-S1 and "moderate" bilateral stenosis at L4-L5 (Exhibit 11F, 60). Nevertheless, in October 2015, she reported doing laundry and noted the machines are two floors beneath her (Exhibit 11F, 130).

* * *

By December 2015, the claimant was observed ambulating with cane with only "mild" diffuse weakness and anterior thigh numbness in the left lower extremity (Exhibit 10F, 214). Straight leg raises were also negative (Exhibit 10F, 214). In January 2016, she was observed with an antalgic gait, tender lumbar facets, and weak left foot flexors (Exhibit 10F, 259). However, the same examination revealed intact sensation, negative leg raises, and improved reflexes (Exhibit 10F, 259). By April 2016, the claimant underwent a lumbar decompression and non-instrumental fusion from L4 through S1 (Exhibit 17F, 13). The following month, in May 2016, the claimant reported "doing great" and that her severe radicular pain had "largely resolved" (Exhibit 17F, 13). A contemporaneous exam revealed full strength and sensation in the extremities, and subsequent imaging revealed a "stable" lumbar spine (Exhibits 15F; 17F, 13). Nevertheless, the claimant continued to be observed with a slightly antalgic gait (Exhibit 17F, 13).

(Tr. 116-117.) The ALJ then discussed Brown's refusal to quit smoking and its negative impact on her lumbar fusion surgery. (Tr. 117.) The decision also noted Brown's failure to follow through with physical therapy in June 2016, after her back surgery. (Tr. 117-118.)

The ALJ summarized his conclusions as follows:

Therefore, in comparing the objective medical evidence to the claimant's subjective complaints, I find the claimant is more capable than alleged (SSR 16-3p). In short, although the claimant has significant orthopedic impairments, the record reflects

multiple examinations with full strength, normal respiration, and independent ambulation, as cited above. In addition, the claimant is able to ambulate effectively with a cane, as she was observed walking for five meters with same and testified she could walk halfway to the bus stop before requiring rest, which she stated is two-tenths-of-a-mile away. She also indicated she could ascend/descend two flights of stairs, as she does laundry in the basement. * * *

Moreover, in October 2014, she reported she could walk five blocks and was looking for employment as an administrative assistant (Exhibit 6F, 6, 9). Collectively, this evidence somewhat undermines the claimant's alleged degree of limitation. * * *

(Tr. 118-119.)

Here, the issue is whether substantial evidence supports the ALJ's determination that Brown did not demonstrate an inability to ambulate effectively for at least 12 months. The "inability to ambulate effectively" is defined as follows:

Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2(b)(1). The regulations provide further guidance regarding effective ambulation, as follows:

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches, or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2(b)(2).

Substantial evidence supports the ALJ's conclusion that Brown does not meet the requirements of Listings 1.02A, 1.03, and 1.04.[5] Notwithstanding Brown's argument to the contrary, it is clear from a review of the decision that the ALJ thoroughly considered the testimonial, medical, and opinion evidence regarding Brown's orthopedic impairments. The ALJ acknowledged Brown's testimony that she required the use of a cane and had difficulty walking and performing daily activities. However, the ALJ cited numerous treatment records from throughout the relevant time period documenting Brown's ability to ambulate independently or with the use of a single cane, as well as medical evidence and hearing testimony indicating she could walk 5 blocks or .2 miles, perform daily activities independently, grocery shop once per month, vacuum twice per month, and climb the stairs into her home using a handrail. In light of the above, Brown's argument the ALJ relied on "limited and misleading portions" of the record is without merit.

Brown asserts the ALJ's step three finding is not supported by substantial evidence because she has been prescribed a cane and a walker. This argument is without merit. Use of a single cane does not "limit the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2(b)(1). For this reason, district courts within this Circuit have

---

[5] Brown does not clearly identify the specific subsections of Listings 1.02 or 1.04 upon which she is relying. In her Brief, however, Brown limits her argument to whether the ALJ erred in finding her capable of ambulating effectively for purposes of 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2(b)(1). *See* Doc. No. 15 at 14 ("The ALJ in this matter specifically determined that these listings were not met or equaled since the Plaintiff could ambulate effectively. . . . It is this specific finding, that Ms. Brown can ambulate effectively, that is in error and requires remand.") Thus, the Court confines its review to this particular issue.

consistently found that use of a single cane or crutch does not establish an inability to walk effectively for the purposes of Listing 1.02(A), 1.03, and 1.04C.  *See, e.g., Sutton v. Berryhill*, 2017 WL 6568183, at *14 (N.D. Ohio Dec. 8, 2017), *report and recommendation adopted by*, 2017 WL 6558165 (N.D. Ohio Dec. 22, 2017); *Toskinski v. Comm'r of Soc. Sec.*, 2018 WL 1468706 at * 9 (N.D. Ohio March 26, 2018); *Brown v. Colvin*, 2016 WL 1068966 at * 10 (N.D. Ohio Feb. 5, 2016) *report and recommendation adopted*, 2016 WL 1071103 (N.D. Ohio March 17, 2016); *Rainey–Stiggers v. Comm'r of Soc. Sec.*, 2015 WL 729670 at * 6 (S.D. Ohio Feb. 19, 2015); *Jackson v. Comm'r of Soc. Sec.*, 2009 WL 612343, at *3 (E.D. Mich. Mar.6, 2009).  *See also Forrest v. Comm'r of Soc. Sec.*, 591 Fed. Appx. 359, 366 (6th Cir. 2014) (finding claimant did not meet requirements of Listing 1.02A where he "used one cane at most, often went without, and could otherwise ambulate effectively during the relevant period.")  Moreover, although Brown testified she was prescribed a walker, she does not direct this Court's attention to any evidence that she consistently used it.  Rather, treatment records reflect Brown ambulated either independently or with a single cane during the relevant time period.  (Tr. 757-760, 747-751, 729-730, 833, 823, 599-600, 1125-1126.)

Brown also argues her inability to ambulate effectively is demonstrated by the fact that she has been noted to have an antalgic, slow gait and difficulty performing daily activities. Listings 1.02, 1.03 and 1.04, however, do not state that having an antalgic gait is sufficient to establish ineffective ambulation.  *See Goddard v. Berryhill*, 2017 WL 2190661 at * 16 (N.D. Ohio May 1, 2017).  Further, while Brown testified she walks at a slower pace, she has not demonstrated she is unable to walk at a *reasonable* pace, as required by Listing 1.00B2(b)(2). With regard to her daily activities, Brown relies on a November 2014 Function Report, in which

professed difficulty with prolonged sitting, standing, and walking. (Tr. 529.) However, in that same Function Report, Brown states that she cleans, does the laundry once per week, irons, prepares meals, and shops. (Tr. 526-527.) The Court also notes that, in June 2014, August 2014, and April 2015, Brown reported she was able to perform activities of daily living at an independent level. (Tr. 757-758, 747-749, 821.) During the August 2016 hearing, Brown testified she prepares her own meals, grocery shops once per month, and vacuums twice per month. (Tr. 357-359.)

Brown nonetheless argues the ALJ erred in finding she is able to ambulate effectively in light of testimony and evidence that she uses special transportation provided by her insurance company. However, Brown has not directed this Court's attention to any medical evidence indicating she was unable to ride in a public transportation vehicle during the relevant time period. Rather, she testified she could not use public transportation because the nearest bus stop was too far from her home (i.e., the bus stop was .4 miles away and she can only walk half way there before needing to stop.) (Tr. 362, 368-369.) Brown has not demonstrated (and cites no authority for the proposition) that this satisfies the definition of "inability to ambulate effectively" as set forth in the regulations.

Finally, although the ALJ's discussion of Listings 1.02, 1.03 and 1.04 at step three is brief, the ALJ explicitly referenced his analysis at step four when analyzing Brown's orthopedic impairments at step three. At step four, the ALJ made sufficient factual findings (discussed at length above) to support his step three conclusion and to enable the Court to meaningfully review the decision. *See Goddard*, 2017 WL 2190661 at * 17; *Rainey–Stiggers*, 2015 WL 729670 at * 7; *Forrest*, 2014 WL 6185309, at *6 (Nov. 17, 2014) (and cases cited therein). *See*

*also Kern v. Comm'r of Soc. Sec.*, 2017 WL 1324609 at * 2 (S.D. Ohio April 11, 2017) ("The Commissioner's decision may be upheld where the ALJ made sufficient factual findings elsewhere in his decision to support the conclusion at step three.").

While the Court acknowledges there is evidence in the record that might support Brown's argument, the ALJ's findings herein are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *See Buxton*, 246 F.3d at 772-3; *Her*, 203 F.3d at 389-90. Rather, as noted above, the substantial evidence standard presupposes "there is a zone of choice within which the [ALJ] may proceed without interference from the courts." *Felisky*, 35 F.3d at 1035. "This 'zone of choice' includes resolving conflicts in the evidence and deciding questions of credibility." *Postell v. Comm'r of Soc. Sec.*, 2018 WL 1477128 at *10 (E.D. Mich. March 1, 2018), *report and recommendation adopted*, 2018 WL 1471445 (E.D. Mich. March 26, 2018). Here, the ALJ's step three findings that Brown did not meet or equal the requirements of Listings 1.02, 1.03, and 1.04 are within that "zone of choice" and thus supported by substantial evidence.[6]

Accordingly, Brown's first assignment of error is without merit.

### *Sentence Six Remand*

---

[6] In her Brief, Brown states, summarily, that the ALJ erred in concluding her orthopedic impairments did not equal a listed impairment. As noted above, a claimant is disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a). Here, Brown does not sufficiently explain how any of her orthopedic impairments are medically equivalent to the requirements of Listings 1.02, 1.03, and/or 1.04. Accordingly, the Court finds this argument without merit.

Brown next argues this matter should be remanded for further administrative proceedings pursuant to Sentence Six of 42 U.S.C. § 405(g) in light of "material new evidence in the form of multiple x-rays and MRIs of weight bearing joints, patient notes detailing decreased sensation in the lower extremities and difficulty with ambulation and medical source statements from treating physicians." (Doc. No. 15 at 16-17.) She asserts that, although some of this evidence pre-dates the ALJ decision, remand is nonetheless required because Brown was unrepresented at the hearing and the ALJ failed in his affirmative duty to fully develop the record. (*Id*. at 17-18.) Brown further argues that "the issue of materiality and not being related to the disability period is a fine line, but the directness of the new evidence, Plaintiff's *pro se* status, and the evidence's impact upon fundamental work abilities strongly warrants its inclusion." (*Id.* at 18.) Lastly, Brown asserts "there is a reasonable probability the Commissioner would have reached a different disposition of [her] claim had this new evidence been available and addressed at the time of the administrative hearing." (*Id*. at 18-19.)

The Commissioner argues remand is not warranted under Sentence Six because the evidence at issue is neither new or material and Brown failed to show good cause as to why it was not submitted prior to the hearing. (Doc. No. 17 at 17-23.) In this regard, the Commissioner notes that, while some of the evidence submitted to the Appeals Council was not in existence at the time of the hearing, much of it pre-dates the ALJ's decision. (*Id*.) The Commissioner argues Brown has failed to show that the allegedly "new" evidence that was in existence prior to the ALJ's decision was not available to her at the time of the decision. (*Id*.) She further asserts the ALJ did not have a heightened duty to develop the record because, although Brown was proceeding *pro se*, she was specifically indicated that (aside from one record that was

subsequently obtained by the ALJ) the medical record was complete.  (*Id*. at 18.)  The Commissioner further argues the evidence submitted by Brown to the Appeals Council is not material because it is largely cumulative of evidence already in the record.  (*Id.* at 21.)  Lastly, she maintains Brown has failed to demonstrate good cause for failing to timely submit the evidence at issue to the ALJ.  (*Id.* at 23.)

The Sixth Circuit has repeatedly held that "evidence submitted to the Appeals Council after the ALJ's decision cannot be considered part of the record for purposes of substantial evidence review."  *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001).  A district court can, however, remand the case for further administrative proceedings in light of such evidence, if a claimant shows the evidence satisfies the standard set forth in Sentence Six of 42 U.S.C. § 405(g).  *Id.  See also Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir.1996); *Lee v. Comm'r of Soc. Sec.*, 529 Fed. Appx. 706, 717 (6th Cir. July 9, 2013) (stating that "we view newly submitted evidence only to determine whether it meets the requirements for sentence-six remand").  Sentence Six provides that:

> The court may ... at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding; and the Commissioner of Social Security shall, after the case is remanded, and after hearing such additional evidence if so ordered, modify or affirm the Commissioner's findings of fact or the Commissioner's decision, or both, and shall file with the court any such additional and modified findings of fact and decision, and, in any case in which the Commissioner has not made a decision fully favorable to the individual, a transcript of the additional record and testimony upon which the Commissioner's action in modifying or affirming was based.

42 U.S.C. § 405(g) (emphasis added).

Interpreting this statute, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357 (quoting *Sullivan v. Finkelstein*, 496 U.S. 617, 626, 110 S.Ct. 2658, 110 L.Ed.2d 563 (1990)). Evidence is "material" only if "there is 'a reasonable probability that the Secretary would have reached a different disposition of the disability claim if presented with the new evidence.'" *Id*. (quoting *Sizemore v. Sec'y of Health & Human Servs*., 865 F.2d 709, 711 (6th Cir.1988)). *See also Bass v. McMahon*, 499 F.3d 506, 513 (6th Cir.2007) (noting that evidence is "material" if it "would likely change the Commissioner's decision."); *Courter v. Comm'r of Soc. Sec*., 2012 WL 1592750 at * 11 (6th Cir. May 7, 2012) (same). Evidence is not material if it is cumulative of evidence already in the record, or if it merely shows a worsening condition after the administrative hearing. *See Prater v. Comm'r of Soc. Sec*.,235 F. Supp.3d 876, 880 (N.D. Ohio 2017). *See also Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 478 (6th Cir.2003); *Sizemore*, 865 F.2d at 712 ("Reviewing courts have declined to remand disability claims for reevaluation in light of medical evidence of a deteriorated condition"); *Deloge v. Comm'r of Soc. Sec*., 2013 WL 5613751 at * 3 (6th Cir. Oct.15, 2013) (same).

In order to show "good cause," a claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ." *Foster*, 279 F.3d at 357. *See also Willis v. Sec'y of Health & Hum. Servs*., 727 F.2d 551, 554 (6th Cir. 1984). "The mere fact that evidence was not in existence at the time of the ALJ's decision does not necessarily satisfy the 'good cause' requirement." *Courter*, 2012 WL 1592750 at * 11. Rather, the Sixth Circuit "takes 'a harder line on the good cause test' with respect to timing, and thus requires that the clamant 'give a valid reason for his failure to obtain

evidence prior to the hearing.'" *Id.* (quoting *Oliver v. Sec'y of Health & Human Servs.*, 804 F.2d 964, 966 (6th Cir.1986)).  This includes "detailing the obstacles that prevented the admission of the evidence." *Courter*, 2012 WL 1592750 at * 11.  *See also Bass*, 499 F.3d at 513.

The burden of showing that a remand is appropriate is on the claimant.  *See Foster*, 279 F.3d at 357; *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 276 (6th Cir. 2010).  When a district court grants remand pursuant to Sentence Six, it "neither affirm[s] nor reverse[s] the ALJ's decision, but simply remand [s] for further fact-finding." *Courter*, 2012 WL 1592750 at * 11.  *See also Melkonyan v. Sullivan*, 501 U.S. 89, 98, 111 S.Ct. 2157, 115 L.Ed.2d 78 (1991).  Under these circumstances, the district court retains jurisdiction and enters final judgment only "after postremand agency proceedings have been completed and their results filed with the court." *Shalala v. Schaefer*, 509 U.S. 292, 297, 113 S.Ct. 2625, 125 L.Ed.2d 239 (1993).  *See also Melkonyan*, 501 U .S. at 98; *Marshall v. Comm'r of Soc. Sec.*, 444 F.3d 837, 841 (6th Cir. 2006).

As noted above, Brown was unrepresented during the administrative hearing.  At the outset of the hearing, the ALJ explained her right to representation:

ALJ:       All right, Ms. Brown, since you're not represented, I have to make sure on the record that you understand your rights to representation.  Did you receive the hearing acknowledgment letter and the enclosures that came with it?

CLMT:  Yes.

ALJ:       Okay.  Did you get a chance to look through those before this time?

CLMT:  Yes, I did.

ALJ:       Let me go over them just briefly, so that we have them on the record.  All right.  You have the right to be represented by either an attorney or a non-attorney in this proceeding.  A representative can help obtain

information about your claim. He can help explain the terms that need explaining to you, can be sort of, act in between, between the Agency and you. The representative may not charge a fee or collect a fee, unless we approve it first. And if you appoint a representative, you may be responsible for some expense such as copying costs and things like that, or obtain medical records from your hospitals. There are some legal organizations that offer representation free of charge, if you meet certain qualifying requirements. And we have a list of those organizations, if you are interested. I think there's also a list included in the documents that we sent you. You also have the right to proceed without the representative. Now, if you choose to proceed with the help of representative, what we would do we would reschedule today's hearing to a later date. It will not be as far in the future as it took for you to get to this hearing today. And during that time, you will be responsible to find someone to represent you. When you come back, after the hearing is rescheduled, when you come back at that time, if you don't have someone representing you, and there's a good reason why you were not represented at that time, we'll go ahead and proceed with the hearing without representation. That's a one shot deal, if you want to postpone to find a representative, we can do that. We just reschedule it for the near future.

CLMT: No.

ALJ: Okay. So, you want to proceed without a representative today?

CLMT: Yes.

ALJ: All right. If, since you, if you choose to proceed without the representative, I will make sure your rights are protected. And I will obtain any evidence that is necessary to dispose of your claim. Okay?

CLMT: Okay.

(Tr. 343-345.) The ALJ then asked Brown if the medical record was complete. (Tr. 346.)

Brown indicated it was missing one record, a June 24, 2016 treatment note from Dr. Kraay. (*Id.*)

The ALJ then specifically asked as follows:

ALJ: Okay. All right. Besides the records from Dr. Kraay, are there any other records that you know are missing from the documents that we currently have, in the record that we currently have. Other than the ones you just handed today.

CLMT: Other than the ones I handed you today, no.

41

ALJ:  Okay.  All right.  Now, you said you looked at your file.  Is that correct?

CLMT:  Yes.

ALJ:  Okay.  Do you have any question about what's in the file, do you have any objection to what's in the file?

CLMT:  No.

(Tr. 346-347.)  The record reflects that, after the hearing, the Agency obtained additional medical records from University Hospital, including the June 24, 2016 treatment record from Dr. Kraay.  (Tr. 593-596, 1409-1410).  The ALJ included these records as Exhibits 17F and 18F, and considered them when rendering his March 14, 2017 decision.  (Tr. 125, 1392-1425.)

After the ALJ issued his decision, Brown retained counsel and submitted more than 300 pages of medical records to the Appeals Council.  (Tr. 8-91, 95-105, 126-339.)  The Appeals Council acknowledged the new evidence but determined (1) the newly submitted medical evidence pre-dating the ALJ decision "does not show a reasonable probability that it would change the outcome of the decision;" and (2) the evidence post-dating the ALJ decision "does not relate to the period at issue" and, therefore, "does not affect the decision about whether you were disabled beginning on or before March 14, 2017."  (Tr. 2.)  Brown disagrees, and asserts the following evidence submitted to the Appeals Council warrants a remand under Sentence Six.[7]

On August 11, 2016, Brown presented to Salim Hayek, M.D., for evaluation of her low back and leg pain.  (Tr. 328-331.)  She reported that, after having back surgery in April 2016, she began experiencing low back and bilateral leg pain in June 2016.  (Tr. 328.)  Brown rated her pain a 7 on a scale of 10, and described it as constant.  (*Id.*)  Brown indicated she continued to

---

[7] The Court's discussion of this evidence is limited to the evidence cited in Brown's brief. (Doc. No. 15 at 10-12, 17-19.)

regularly smoke.  (Tr. 330.)  She stated "she has become somewhat more unsteady with her gait and has required a cane for walking."  (Tr. 328.)  On examination of Brown's lumbar spine, Dr. Hayek noted limited range of motion and no tenderness.  (Tr. 329.)  Dr. Hayek also found severely decreased sensation to pinprick in Brown's left lower leg below the knee, mildly decreased sensation in her right lower leg beneath the knee, and reduced muscle strength in her bilateral lower extremities.  (Tr. 330.)  Dr. Hayek counseled Brown on the importance of quitting smoking, however, Brown "became upset and walked out of the clinic."  (*Id*.)

On November 23, 2016, Brown underwent an x-ray of her pelvis which showed discogenic degenerative changes of the visualized lumbar spine.  (Tr. 339.)

On December 9, 2016, Brown returned to Dr. Patterson for evaluation of anterior thigh discomfort.  (Tr. 210-211.)  She complained of "some giving way in the right knee."  (*Id*.)  On examination, Dr. Patterson noted a "slight antalgic gait favoring the right knee," as well as mild crepitus and a mild degree of atrophy in the right quadriceps.  (*Id*.)  He also found no knee instability, intact sensation in the right foot, and a "bounding" pulse.  (*Id*.)  Dr. Patterson prescribed a home exercise program but noted "she may ultimately require a total [right] knee arthroplasty."  (*Id*.)  On that same date, Brown underwent an x-ray of her right knee which showed a "considerable degree of degenerative osteoarthritis," as well as an old bone infarct. (Tr. 214.)

On January 27, 2017, Brown presented for physical therapy with Ashima Narayan, P.T. (Tr. 240-248.)  She complained of right knee pain since the previous year, indicating her knee "'slips' going from sit to stand."  (Tr. 242.)  She described her pain as constant and varying in intensity from a 5 to a 10 on a scale of 10.  (*Id*.)  Brown indicated she was independent with self

care and "independent with [activities of daily living,] slow." (*Id.*)  She also stated she could climb stairs independently at home but with difficulty.  (Tr. 244.)  Examination revealed right knee tenderness and crepitus, intact sensation in Brown's bilateral lower extremities, and reduced muscle strength.  (Tr. 243.)  Ms. Narayan described Brown's gait as "antalgic, independent with straight cane, slow."  (*Id.*)

On April 19, 2017, Brown returned to Dr. Ahn.  (Tr. 95-98.)  His treatment note provides (in relevant part) as follows:

> She is doing great from her lumbar surgery. The unrelenting back pain [and] the severe left leg pain that she had before surgery has resolved.
>
> Since February, she started expressing discomfort in her right knee and anterior thigh. Again, she did not have this until February, and she states that the symptoms really started after a twisting/falling incident on 2/24/17.  In any event, she did have a previous right knee surgery. She had a fracture with removal of a bone fragment. She states that it did involve her articular surface.
>
> On exam, she has tenderness with internal/external rotation of her right hip produc[ing] groin and anterior thigh pain.  She also has significant discomfort with any range of motion of her right knee that causes pain into her anterior thigh. There is a bit of a valgus deformity when she stands.
>
> There is significant crepitus when I try to flex her knee, and she can only flex to about 90.  She cannot perform a squat.  McMurray sign is positive. She has 5/5 strength in the lower extremities with normal sensation. There is no radiculopathy or myelopathy. Her lumbar wound is healed.  She also finally quit smoking which is of course of great benefit for her as well.

(Tr. 95.)  Dr. Ahn expressed concern regarding her right knee and ordered imaging.  (*Id.*)

Brown underwent an x-ray of her lumbar spine on that same date, which revealed (1) partial lumbarization of S1; (2) redemonstration of posterior decompression of L4 and L5; (3) degenerative disc disease throughout the lumbar spine worst at L4-5, unchanged; (4) grade 2 L5-

S1 anterolisthesis, increased; and (5) grade 1 L4-5 anterolisthesis, also increased since prior study. (Tr. 103.)

Several days later, on April 23, 2017, Brown underwent an x-ray of her right knee which showed (1) redemonstration of a similar-appearing serpiginous sclerosis involving the proximal tibial metaphysis and epiphysis, concerning for bone infarct; and (2) tricompartmental osteoarthritic changes, severe within patellofemoral compartment. (Tr. 102.)

On May 1, 2017, Brown underwent an MRI of her right knee, which revealed (1) tricompartmental osteoarthrosis, most advanced in the patellofemoral compartment where there is diffuse full-thickness articular cartilage loss with underlying subchondral cyst formation and reactive marrow edema; (2) markedly hypoplastic trochlea; (3) peripheral vertical tear of the posterior horn of the medial meniscus at the meniscocapsular junction; (4) distal quadriceps tendinosis; and (5) bone infarcts involving the distal right femur and proximal right tibia. (Tr. 101.)

On June 8, 2017, Brown underwent an MRI of her hips, which revealed minimal osteoarthritis of the right hip and lower lumbar degenerative changes. (Tr. 12-13.)

On June 14, 2017, Brown's cardiologist, Dr. Dong, completed a Medical Source Statement regarding her Physical Capacity. (Tr. 10-11.) Dr. Dong noted Brown had been prescribed a walker. (*Id*.) He stated she experienced severe pain that would interfere with concentration, take her off task, and cause absenteeism. (*Id*.) He did not assess any lifting, carrying, sitting, standing, walking, or postural limitations. (*Id*.) Dr. Dong explained as follows: "I am the patient's cardiologist and from a heart stand point she has been doing well. We are

getting a cardiac stress test done and if that is normal, she should not have any significant restrictions from her heart." (Tr. 11.)

On June 28, 2017, Dr. Ahn completed a Medical Source Statement regarding Brown's Physical Capacity. (Tr. 8-9.) He found Brown could lift 5 pounds occasionally and frequently; stand/walk for a total of 3 hours and ½ hour without interruption; and sit for a total of 5 hours and 2 hours without interruption. (*Id.*) Dr. Ahn concluded Brown could occasionally balance and push/pull; and rarely climb, stoop, crouch, kneel, and crawl. (*Id.*) He found she could frequently reach and engage in fine and gross manipulation. (*Id.*) Dr. Ahn noted Brown had been prescribed both a cane and a walker, and would need to be able to alternate positions at will between sitting, standing, and walking. (*Id.*) Like Dr. Dong, he stated Brown experienced severe pain that would interfere with concentration, take her off task, and cause absenteeism. (*Id.*) Finally, Dr. Ahn found Brown would require additional rest periods during an 8 hour workday outside of standard breaks. (*Id.*) Specifically, Dr. Ahn estimated Brown would require 2 to 4 hours of additional rest time on an average day. (*Id.*) He identified diagnoses of right hip osteoarthritis, lumbar stenosis status post lumbar surgery, and medical findings of antalgic gait, and painful right hip and knee. (*Id.*)

The Court finds Brown has not demonstrated a Sentence Six remand is warranted. First, Brown has not demonstrated some of the evidence at issue is "new." Several of the medical records submitted to the Appeals Council (i.e., the August 2016 treatment note from Dr. Hayek; the November 13, 2016 pelvic x-ray; the December 2016 treatment note from Dr. Patterson; the December 2016 right knee x-ray; and the January 27, 2017 physical therapy treatment note) pre-date the ALJ's March 14, 2017 decision. (Tr. 328-331, 339, 210-211, 214,

240-248.)  As noted above, the Sixth Circuit has held that "evidence is new only if it was 'not in existence or available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357 (quoting *Sullivan*, 496 U.S. at 626).  These particular records are not "new" because (1) they were in existence prior to the ALJ decision; and (2) Brown does not argue they were not available to her at that time.

Brown maintains, however, this evidence should nonetheless be considered "new" because "the records existed and the claimant alerted the ALJ to their existence."  (Doc. No. 15 at 17-18.)  She asserts that, in light of her *pro se* status, the ALJ had a heightened duty to develop the record, which he failed to meet.  (Doc. No. 15 at 17-18.)  For the following reasons, this argument is without merit.

As an initial matter, the record does not support Brown's contention that she "alerted the ALJ to the existence" of these particular records.  During the hearing, the ALJ specifically asked Brown whether the medical record was complete.  (Tr. 346.)  Brown indicated there was one missing record; i.e., Dr. Kraay's June 24, 2016 treatment note.  (*Id*.)  The ALJ obtained Brown's written authorization to request this treatment note, which he subsequently obtained and included in the administrative record.  (Tr. 346-347.)  The ALJ specifically asked if there were "any other records that you know are missing from the documents that we currently have, in the record that we currently have."  (*Id*.)  Brown replied "no."  (*Id*.)  The ALJ also confirmed with Brown that she had "looked at [her] file" and had no objection.  (*Id*.)  Thus, although expressly asked about the completeness of the record, Brown failed to alert the ALJ to the existence of the records noted above.  (Tr. 328-331, 339, 210-211, 214, 240-248.)  *See Daniels v. Colvin*, 2016 WL 4543473 at * 6 (E. D. Mich. Aug. 1, 2016), *report and recommendation adopted*, 2016 WL

4525276 (E.D. Mich. Aug. 30, 2016) (denying Sentence Six remand where "the ALJ asked [the *pro se* claimant] during the hearing whether there was any other evidence that existed, and she said there was not.")

Brown nevertheless asserts the ALJ had a "heightened duty" to develop the record in light of her *pro se* status. In the Sixth Circuit, it is well established that the claimant—not the ALJ—has the burden to produce evidence in support of a disability claim. *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 280 Fed. Appx. 456, 459 (6th Cir. 2008) (citing 20 C.F.R. § 404.1512(a)). *See also Struthers v. Comm'r of Soc. Sec.*, 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y. of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d)."); *cf. Wright–Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (although an "ALJ has an inquisitorial duty to seek clarification on material facts," a plaintiff, who is represented by counsel, must provide a "factual record" relating to the length of his employment when his past work was part of the record and was the basis of the initial decision to deny benefits). However, there is a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson*, 280 Fed. Appx. at 459 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)).

Here, the Court finds Brown has not demonstrated the ALJ had a "heightened duty" to obtain the particular records noted above and include them in the administrative record. Brown has not argued she was "unfamiliar with hearing procedures" or "incapable of presenting an effective case." *Wilson*, 280 Fed. Appx. at 459. As noted above, the ALJ thoroughly explained to Brown that she had the right to representation at the hearing. (Tr. 344-345.) He offered her the option of a short postponement to allow her to obtain either counsel or a non-attorney representative, specifically noting a representative "can help obtain information about your claim." (*Id.*) Brown declined. (Tr. 345.) The record does not reflect, and Brown does not argue, that she failed to understand her right to representation or was incapable of presenting an effective case. In this regard, the Court notes Brown is well-educated, with both a bachelor's degree and two master's degrees. (Tr. 351.) Moreover, although the record indicates she suffers from depression, the psychological consultative examiner, Dr. Konieczny, found no indications of impairment in Brown's speech, thought content, judgment, or ability to concentrate and attend to tasks. (Tr. 598-600.) Accordingly, the Court finds this argument without merit.

With regard to the medical records post-dating the ALJ's decision, the Court finds Brown has not demonstrated these records are "material." These records include Dr. Ahn's April 19, 2017 treatment note; the April 19, 2017 lumbar x-ray; the April 23, 2017 right knee x-ray; the May 1, 2017 right knee MRI; and the June 8, 2017 bilateral hip MRI. (Tr. 12-13, 95-98, 100-103.) Upon review, the Court finds these records are largely cumulative of the treatment records and diagnostic imaging before the ALJ. *See Elliott v. Apfel*, 28 Fed. Appx. 420, 425 (6th Cir. 2002) (denying Sentence Six remand where newly-submitted evidence is "merely cumulative"); *Defrank v. Colvin*, 2016 WL 3898441 at * 6 (N.D. Ohio July 19, 2016) ("The

Sixth Circuit has held that a [Sentence Six] remand is improper if the new evidence is 'largely cumulative of evidence and opinions already in the record.") (citing *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 598 (6th Cir. 2005)). Indeed, in the decision, the ALJ expressly considered and reviewed (1) treatment records from May and June 2016 documenting Brown's complaints of pain in her lumbar spine and right knee (Tr. 117-118, 1404-1406, 1409-1410); (2) May 2016 imaging of Brown's right knee showing tricompartmental osteoarthritis with marked joint space narrowing, sclerosis, and osteophytosis (Tr. 118, 1384); and (3) July 2016 imaging of her lumbar spine showing grade 1 anterolisthesis of L5 and degenerative changes of the lower lumbar spine most prominent at L4-5 and L5-S1 (Tr. 117, 1382.) Brown has failed to sufficiently explain how this newly-submitted evidence is not cumulative to the evidence already considered by the ALJ in rendering his decision.

As noted above, post-hearing evidence is material "only if there is a reasonable probability that the [Commissioner] would have reached a different disposition of the disability claim if presented with [it]." *Foster*, 279 F.3d at 357. *See also Lee*, 529 Fed. Appx. at 718. Here, and in light of the cumulative nature of the imaging and treatment records at issue, Brown has failed to show a reasonable probability that the medical records post-dating the ALJ decision would have caused the ALJ to reach a different disposition of her claim.

Lastly, Brown argues remand is required under Sentence Six in light of the newly-submitted treating physician opinions of Dr. Dong and Dr. Ahn, both of which were completed in June 2017. (Tr. 8-9, 10-11.) This argument is without merit. First, Brown has failed to demonstrate these opinions are "new," i.e., that they were not "available to the claimant at the time of the administrative proceeding.' " *Foster*, 279 F.3d at 357. While these physicians did not

complete their opinions until June 2017 (roughly three months after the ALJ decision), Brown

has offered no explanation as to why she could not have requested and submitted opinions from

these physicians before the ALJ issued his decision.  Indeed, the Court notes Brown began

treatment with Dr. Dong in October 2015 (Tr. 1041-1045) and with Dr. Ahn in May 2016 (Tr.

1404-1406), well prior to the August 2016 hearing and the March 2017 ALJ decision.  *See Lee*,

529 Fed. Appx. at 718 (denying Sentence Six remand where "[d]espite the fact that Dr. Wan

started treating Lee in July 2010, Lee [who was proceeding without counsel] has not explained

why she did not obtain this evidence before the ALJ's February 2011 decision.")

Moreover, Brown has failed to demonstrate "good cause" for her failure to timely

present the opinions of Dr. Dong and Dr. Ahn.  As noted *supra*, in order to show "good cause," a

claimant must "demonstrat[e] a reasonable justification for the failure to acquire and present the

evidence for inclusion in the hearing before the ALJ."  *Foster*, 279 F.3d at 357.  *See also Willis*,

727 F.2d at 554.  Brown argues her *pro se* status constitutes "good cause."  The Court disagrees.

"Although a Plaintiff's *pro se* status 'is relevant to the 'good cause' inquiry,' it is not, alone,

sufficient to show good cause."  *Defrank*, 2016 WL 3898441 at * 6 (quoting *Hollon ex rel.*

*Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 484 (6th Cir. 2006).  *See also Anthony v. Comm'r*

*of Soc. Sec.,* 2013 WL 6840359 at * 7 (N.D. Ohio Dec. 27, 2013); *Marok v. Astrue*, 2010 WL

2294056 at * 8 (N.D. Ohio June 3, 2010).

Here, aside from citing her *pro se* status, Brown provides no explanation for her failure

to timely obtain and submit the opinions of Drs. Dong and Ahn.  (Doc. No. 15 at 18.)  As noted

above, Brown was expressly provided the opportunity to postpone her hearing until she could

retain counsel or a non-attorney representative, but she declined.  While some courts have

remanded where evidence suggests a *pro se* claimant suffers from a mental or intellectual impairment that impeded her ability to effectively present her case,[8] such is not the case here. To the contrary, Brown is college educated and has not directed this Court's attention to any evidence she suffers from a mental impairment that would have limited her ability to pursue her claim. While the Court recognizes the difficulties facing an unrepresented disability claimant, Brown has failed to demonstrate her *pro se* status constitutes "good cause" for her failure to timely submit the opinions of Drs. Dong and Ahn under the circumstances presented.

Accordingly, and for all the reasons set forth above, the Court finds Brown has failed to carry her burden of demonstrating a Sentence Six remand is warranted. Brown's second assignment of error is without merit.

## VII.   CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

   *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: July 24, 2018

---

[8] *See, e.g., Keesee v. Comm'r of Soc. Sec.*, 2011 WL 2532393 (E.D. Tenn. June 6, 2011), *report and recommendation adopted*, 2011 WL 2530822 (E.D. Tenn. June 24, 2011).